# United States District Court
**EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

| | |
|---|---|
| ALTAGRACE EXUME, § | |
| § | |
| *Plaintiff,* § | |
| v. § | Civil Action No. 4:24-cv-205 |
| § | Judge Mazzant |
| UNITED CARGO LOGISTICS, LLC, § | |
| et al., § | |
| § | |
| *Defendants.* § | |

## MEMORANDUM OPINION AND ORDER

Pending before the Court is Defendant United Cargo Logistics, LLC's Motion to Exclude Expert Testimony of Roberto Cavazos, Ph.D. (Dkt. #29). Having considered the Motion, the relevant pleadings, and the applicable law, the Court finds that the Motion should be **GRANTED**.

## BACKGROUND

The current dispute arises from a motor vehicle accident that occurred on October 26, 2022 (Dkt. #22 at ¶ 11). While Plaintiff Altagrace Exume was following behind a tractor-trailer driven by Defendant Alexys Figueredo, a spare tire fell from the truck and struck Plaintiff's vehicle (Dkt. #22 at ¶ 11). Plaintiff allegedly suffered injuries as a result of the collision (Dkt. #22 at ¶ 11). Plaintiff alleges that Defendant United Cargo Logistics, LLC ("UCL") is liable for Plaintiff's injuries under a variety of negligence and vicarious liability theories (*See* Dkt. #22 at ¶¶ 14–17).

Plaintiff filed suit in Texas State Court on January 24, 2024 (Dkt. #2). UCL removed the action to this Court on March 6, 2024, asserting diversity of citizenship as a basis for jurisdiction (Dkt. #1; Dkt. #8). Plaintiff moved to remand the case on April 4, 2024 (Dkt. #7). The Court found that it has subject matter jurisdiction and denied the motion to remand on October 31, 2024 (Dkt.

#39). UCL moved to strike Plaintiff's expert economist, Robert Cavazos, on September 4, 2024, arguing that his opinion was unreliable, speculative, and unsupported by the evidence (Dkt. #29). Plaintiff filed her Response on September 18, 2024 (Dkt. #31). UCL filed its Reply on September 25, 2024 (Dkt. #32).

## LEGAL STANDARD

Federal Rule of Evidence 702 provides for the admission of expert testimony that assists the trier of fact to understand the evidence or to determine a fact in issue. FED. R. EVID. 702. In *Daubert v. Merrell Dow Pharms., Inc.*, the Supreme Court instructed courts to function as gatekeepers and determine whether expert testimony should be presented to the jury. 509 U.S. 579, 590–93 (1993). Courts act as gatekeepers of expert testimony "to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kuhmo Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999).

The party offering the expert's testimony has the burden to prove that: (1) the expert is qualified; (2) the testimony is relevant to an issue in the case; and (3) the testimony is reliable. *Daubert*, 509 U.S. at 590–91. A proffered expert witness is qualified to testify by virtue of his or her "knowledge, skill, experience, training, or education." FED. R. EVID. 702. Moreover, to be admissible, expert testimony must be "not only relevant but reliable." *Daubert*, 509 U.S. at 589. "This gate-keeping obligation applies to all types of expert testimony, not just scientific

2

testimony." *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 244 (5th Cir. 2002) (citing *Kuhmo*, 526 U.S. at 147).

In deciding whether to admit or exclude expert testimony, the Court should consider numerous factors. *Daubert*, 509 U.S. at 594. In *Daubert*, the Supreme Court offered the following, non-exclusive list of factors that courts may use when evaluating the reliability of expert testimony: (1) whether the expert's theory or technique can be or has been tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error of the challenged method; and (4) whether the theory or technique is generally accepted in the relevant scientific community. *Id.* at 593–94; *Pipitone*, 288 F.3d at 244. When evaluating *Daubert* challenges, courts focus "on [the experts'] principles and methodology, not on the conclusions that [the experts] generate." *Daubert*, 509 U.S. at 595.

The *Daubert* factors are not "a definitive checklist or test." *Id.* at 593. As the Supreme Court has emphasized, the *Daubert* framework is "a flexible one." *Id.* at 594. The test for determining reliability can adapt to the particular circumstances underlying the testimony at issue. *Kuhmo*, 526 U.S. at 152. Accordingly, the decision to allow or exclude experts from testifying under *Daubert* is committed to the sound discretion of the district court. *St. Martin v. Mobil Expl. & Producing U.S., Inc.*, 224 F.3d 402, 405 (5th Cir. 2000) (citations omitted).

## ANALYSIS

UCL challenges the admissibility of Cavazos's opinions, arguing that they are speculative, unreliable, and not based on supporting evidence (*See* Dkt. #29 at ¶¶ 9–11). Primarily, UCL focuses on the lack of evidence to support Cavazos's opinions (*See* Dkt. #29 at ¶¶ 9–11). Specifically, UCL notes that Cavazos relied on an interview with Plaintiff to conclude the amount

of lost wages and earning capacity she will be subjected to, but that Plaintiff did not disclose any part of the interview (Dkt. #29 at ¶ 9). Further, UCL argues that Cavazos did not consider any other factors when determining Plaintiff's income at the time of her injury, basing his opinion on three pay stubs from 2024 (Dkt. #329 at ¶¶ 9–10). Similarly, UCL challenges Cavazos's opinion of lost household services because it is based on the undisclosed interview (Dkt. #29 at ¶ 9).

Plaintiff initially responds by arguing that the Court should continue its ruling on UCL's motion until UCL deposes Cavazos (Dkt. #31 at pp. 2–4). On Plaintiff's understanding, it would be improper for the Court to consider Cavazos's reliability and methodology without his deposition (Dkt. #31 at pp. 2–4). Thus, according to Plaintiff, the Court should wait to rule on UCL's motion until after UCL deposes Cavazos (Dkt. #31 at pp. 2–4). Next, Plaintiff argues that Cavazos's opinions are admissible because he relied on the type of information that economists normally utilize in their analyses (Dkt. #31 at pp. 6–8). Specifically, Plaintiff argues that Cavazos's interview with her, the three pay stubs, and the Social Security Earnings Statement provide sufficient information to support the reliability of Cavazos's opinions (Dkt. #31 at pp. 6–8). In addition to these arguments, Plaintiff briefly addresses two other points. First, she argues that UCL presented no argument against Cavazos's loss of household services opinion and has thereby waived that challenge (Dkt. #31 at p. 6). Second, Plaintiff argues that UCL did not cite to any authority for its argument that Plaintiff must disclose the content of the interview (Dkt. #31 at p. 8). Essentially, Plaintiff argues that UCL can only learn the content of the interview if it deposes Cavazos (Dkt. #31 at p. 8).[1]

---

[1] Plaintiff cites no authority to support this proposition (*See* Dkt. #31 at p. 8).

UCL addresses Plaintiff's arguments in its Reply (*See* Dkt. #32). UCL first addresses Plaintiff's request for a continuance by arguing that an expert report is required to be a complete and accurate statement of all opinions to be expressed, such that a deposition is not required to fix a deficient expert report (*See* Dkt. #32 at pp. 2–3). Next, UCL reemphasizes the shortcomings of Cavazos's opinion: there is no information about the interview between Plaintiff and Cavazos, Cavazos does not state what Plaintiff's job is, he does not analyze the differences in Plaintiff's income before the collision and after her injury, he does not consider the effect of the injury on her work, and he does not address whether Plaintiff has had to take any time off (Dkt. #32 at p. 4). UCL similarly points out the lack of information to support Cavazos's loss of household services calculations and his failure to consider the variances in Plaintiff's income as shown on the Social Security Earnings Statement (Dkt. #32 at pp. 4–5).

The Court will begin its analysis by determining whether a continuance is warranted. It is not. Next, the Court will provide a brief overview of the content of Cavazos's expert report before analyzing whether his opinions are admissible under the *Daubert* framework. The Court will first consider Cavazos's opinion regarding lost wages and earning capacity. Then, the Court will proceed to evaluate Cavazos's opinion on loss of household services. Ultimately, the Court agrees with UCL that Cavazos's proffered testimony is unreliable and should be excluded.

## I. Continuance Until Cavazos is Deposed

Plaintiff's first response to UCL's Motion is to urge the Court to postpone consideration of UCL's Motion until after UCL deposes Cavazos (Dkt. #31 at pp. 2–4). Plaintiff's primary contention is that Cavazos's deposition is required for the Court to fully consider whether his opinion is reliable (*See* Dkt. #31 at pp. 2–4). Plaintiff goes as far as arguing that it would be premature for the Court to rule on UCL's Motion before Cavazos is deposed (Dkt. #31 at pp. 3–4)

(citing *Galvez v. KLLM Transp. Servs. LLC*, No. 3:20-CV–238-D, 2021 WL 1966814, at *1–2 (N.D. Tex. May 17, 2019); *Rivera v. Robinson*, No. 18-14005, 2019 WL 13107354, at *3 (E.D. La. Nov. 5, 2019)). UCL advances two arguments in response: (1) Plaintiff's cited authority does not stand for the proposition that striking an expert before a deposition is premature; and (2) that Plaintiff's argument overlooks Federal Rule of Civil Procedure 26's requirement that the expert report contain a full statement of all opinions to be expressed, including the facts and data underlying that opinion (*See* Dkt. #32 at pp. 1–3). The Court agrees with UCL.

First, discovery closed on March 20, 2025. Neither party has alerted the Court that Cavazos was deposed, even though months have passed since the filing of UCL's Motion. Thus, the Court finds that ample time has passed, and it should rule on the instant Motion. Second, Plaintiff's response is misplaced in this case. In essence, Plaintiff has attempted to argue that UCL *must* depose Cavazos to move to strike his testimony (*See* Dkt. #31 at pp. 2–4). The Court is unaware of any such rule in Federal Procedure, nor has Plaintiff cited binding authority on this Court to suggest such a rule exists (*See* Dkt. #31). While the deposition of an expert witness is undoubtedly best practice and helpful to the Court when evaluating a *Daubert* challenge, a deposition is not required before a party moves to exclude the testimony. FED. R. CIV. P. 30(a)(1) ("A party *may* by oral questions, depose any person . . .") (emphasis added); *State Auto. Mut. Ins. Co. v. Freehold Mgmt., Inc.*, No. 3:16-CV-2255-L, 2019 WL 1436659, at *25 (N.D. Tex. Mar. 31, 2019). Plaintiff has cited no binding authority for the proposition that an expert *must* be deposed before this Court can rule on UCL's Motion to Strike. Further, UCL is correct that Rule 26 requires a complete statement of all opinions the expert will express, the basis for them, and the facts and data considered by the expert in forming those opinions. FED. R. CIV. P. 26(a)(2)(B)

6

Third, Plaintiff's cited authority does not stand for the propositions that she argues for. For example, Plaintiff cites to *Williams v. Am. Honda Motor Co.*, for the proposition that a deposition is required before a motion to strike because it will allow UCL to "fully explore [Cavazos's] analysis and the basis for his opinions" (Dkt. #31 at p. 4). No. 6:20-cv-00022, 2022 WL 1074163, at *3–4 (E.D. Tex. Apr. 8, 2022). Yet, *Williams* discussed the importance of a deposition when striking the plaintiff's experts as a sanction for discovery abuse and cancelling the scheduled depositions. *Id.* Plaintiff also cites two cases to argue that it is premature for the Court to rule on the Motion to Strike before Cavazos's deposition (Dkt. #31 at p. 3) (citing *Galvez*, 2021 WL 1966814, at *1–2; *Rivera*, 2019 WL 13107354, at *3). Neither case is applicable here. The Northern District of Texas in *Galvez* cited its typical practice of requiring a deposition before considering a *Daubert* motion. *See Galvez*, 2021 WL 1966814, at *1 (citing *Klien v. Fed. Ins. Co.*, Nos. 7:03-CV-102-D, 7:09-CV-094-D, 2014 WL 6885973, at *1 (N.D. Tex. Dec. 8, 2014)). Thus, it reached its conclusion based on local *preference*, not a compulsory rule of law. *See id.* Likewise, the *Rivera* Court did not deal with an expert report at all; rather, it addressed the relevance of testimony from eyewitnesses who had not yet been deposed. 2019 WL 13107354, at *3. The Court finds that these authorities are not persuasive in the current case. Plaintiff has failed to direct the Court to any binding precedent that states that it cannot evaluate UCL's Motion without a deposition, especially after the discovery deadline has passed. Here, UCL had the right to depose Cavazos to explore his opinions and chose not to do so. However, the right to depose an expert does not extinguish Plaintiff's obligation to comply with Rule 26 and *Daubert*. As the Court discusses below, Plaintiff has not complied.

## II.    Cavazos's Expert Report

Cavazos's Report begins by stating that his area of expertise is as an economist and statistician (Dkt. #29–1 at ¶ 1). He has thirty years of experience as a statistician, holding a BA,

7

MPA, and PhD from the University of Texas (Dkt. #29-1 at ¶ 2). Over his professional career, he has worked on issues including lost earnings litigation matters, labor management relations for "global multinationals" and has performed research and evaluations for the U.S. Department of Labor (Dkt. #29-1 at ¶ 2). Prior to his foray into full-time expert consulting for litigation matters, Cavazos was a faculty member at the University of Texas, San Antonio, Florida International University, and Carnegie Mellon University, where he taught graduate level economics and statistics (Dkt. #29-1 at ¶ 2).

To prepare his opinion for this case, Cavazos reviewed two sets of documents: documents related to this litigation and various treatises and statistical data (Dkt. #29-1 at pp. 10–12). Cavazos considered the following litigation-specific documents and information:

1. An interview with Plaintiff on June 23, 2024 (*See* Dkt. #29-1 at pp. 5 n.1; 7 n.2; 15 n.3);
2. A document listed as "20240307 EXUME ALTAGRAACE [sic]#2 – POP.pdf" (Dkt. #29-1 at p. 10);[2]
3. Plaintiff's Social Security Earnings Statement (Dkt. #29-1 at p. 10; Dkt. #31 at pp. 12–18); and
4. Three of Plaintiff's paystubs from March 15, 2024, March 29, 2024, and April 26, 2024 (Dkt. #29-1 at p. 10; Dkt. #31 at pp. 16–18).

Notably, Cavazos does not state that he reviewed any medical records, does not purport to know what Plaintiff's injury is, how that injury affects her work, nor did he consult with a vocationalist to determine the extent the injury impacts Plaintiff's future earning capacity (*See* Dkt. #29-1). Further, neither Cavazos nor Plaintiff have explained the factual content Cavazos relied

---

[2] Unfortunately, the title of the document is the only information the Court has about its content. Cavazos cites this document one time when he quotes Plaintiff's Complaint (Dkt. #29-1 at ¶ 12). Plaintiff does not explain what Cavazos considered in this document (*See* Dkt. #31). Accordingly, the Court can only assume the document was Plaintiff's Complaint as there is no other indication of what the document includes.

8

on from the purported interview, how long it lasted, or how it impacted Cavazos's opinions (*See* Dkt. #29-1).[3] Instead, he uses it to support two conclusions: the Plaintiff will lose approximately $15,000 per year in wages and that Plaintiff can no longer perform 50% of the household services she did before her injury (Dkt. #29-1 at ¶¶ 16, 28).

Cavazos's general methodology to calculate lost wages and earning capacity is simple. First, he makes his conclusion that Plaintiff will lose $15,000 per year in wages for the rest of her working life due to her injuries (Dkt. #29-1 at ¶ 16). Next, he estimates that Plaintiff has sixteen remaining years for her work life (Dkt. #29-1 at ¶ 18).[4] After determining Plaintiff's remaining work life based on a single source, he then applies a corresponding annual increase to the $15,000 of 3.5% for inflation and annual present value of discount of 4.527% (Dkt. #29-1 at ¶¶ 18–20). Notably, Cavazos concludes, with no factual support, that Plaintiff's lost wages will remain constant, meaning that he concluded that Plaintiff's injury is permanent and will affect her earning capacity for the rest of her life (*See* Dkt. #29-1). He then concludes that Plaintiff has suffered $248,219 in past and future lost wages and earning capacity (Dkt. #29-1 at ¶ 21).

Cavazos provides a similar analysis for loss of household services. First, he concludes that prior to her injury, Plaintiff spent approximately 2.89 hours per day on various household services

---

[3] Defendant argues that Plaintiff should have disclosed the content of the interview with Cavazos (*See* Dkt. #29 at ¶¶ 4, 9; Dkt. #32 at p. 4). Plaintiff retorts that "[t]o the extent that [UCL] complains that Dr. Cavazos did not 'produce' his interview of Ms. Exume, [UCL] fails to point to any support for such a position. Any questions it may have about the information she gave Dr. Cavazos may be discussed in the depositions of Dr. Cavazos, or Ms. Exume herself." (Dkt. #31 at p. 8). Plaintiff is mistaken. Federal Rule of Civil Procedure 26(a)(2)(B)(ii) requires that Plaintiff disclose the facts and data that form the basis for Cavazos's opinions. As such, Rule 26 requires Plaintiff to disclose or Cavazos to discuss the factual content of the interview that led to his conclusions, irrespective of a deposition.

[4] Cavazos does not explain how he reached sixteen years as Plaintiff's remaining work life (*See* Dkt. #29-1). He only provides a citation to one source: Journal of Econometrics, Daniel L. Millimet, Michael Neiswiadomy, Hang Ryu, and Daniel Slotje, "Estimating Worklife Expectancy: An Econometric Approach," 2023 (Dkt. #29-1 at ¶ 18; Dkt. #29-1 p. 11). Assuming this treatise is reliable and regularly utilized by experts in this field, Cavazos has still failed to explain what facts he used in conjunction with the treatise, as well as his methodology, to reach his conclusion.

9

(Dkt. #29-1 at pp. 6-7, 15). His basis for this conclusion is a "survey" presumably conducted after Plaintiff's accident (Dkt. #29-1 at ¶ 28).[5] Additionally, Cavazos concludes that Plaintiff can only perform 50% of these household services for the rest of her life, due to her injury (Dkt. #29-1 at ¶ 28).[6] He then states that Plaintiff will perform those services until her actuarial projected death, which is projected to be at the age of seventy-eight (Dkt. #29-1 at ¶ 29). After collecting the underlying conclusions, he then applies the same annual inflation and present value discount multipliers to conclude that Plaintiff has suffered a total of $395,294 in past and future loss of household services (Dkt. #29-1 at ¶¶ 29-31). To conclude his report, he adds all of Plaintiff's economic damages together for a grand total of $643,513 (Dkt. #29-1 at ¶ 32).

### III. Lost Wages and Earning Capacity

Cavazos's expert report contains analytical gaps that render his opinion regarding Plaintiff's lost wages and earning capacity unreliable. Perhaps the most important conclusion drawn in his report is that Plaintiff will lose approximately $15,000 per year (Dkt. #29-1 at ¶ 16). To reach this conclusion, he reports that he relied on an interview with Plaintiff on July 23, 2024 (Dkt. 29-1 at ¶ 16 n.1). However, the report does no more than cite this interview without providing any details as to why Plaintiff will actually lose $15,000 per year or even what her job is

---

[5] Cavazos provides no details regarding the survey (*See* Dkt. #29-1). There are no details regarding the length of the survey, who recorded the survey, or what specific tasks were performed (*See* Dkt. #29-1). Instead, Cavazos concludes, without explaining any factual basis or his methodology, that Plaintiff's pre-injury household services totaled approximately 2.89 hours of work per day based on a post-injury survey and the interview with Plaintiff (*See* Dkt. #29-1).

[6] To reach this conclusion, Cavazos cites to the interview with Plaintiff (Dkt. #29-1 at ¶ 28 n.2). Again, he provides no discussion of the facts or methodology that led him to this conclusion.

(*See* Dkt. #29-1).[7] Cavazos takes Plaintiff's statement at face value, basing his entire methodology on the mere fact that Plaintiff herself claims that she will lose $15,000 per year (*See* Dkt. #29-1). While an expert can rely on what an interested party tells him, he cannot forgo his own independent analysis and exclusively rely on the interested party's information to form his opinion—which is what Cavazos has done. *Orthoflex, Inc. v. ThermoTek, Inc.*, 986 F. Supp. 2d 776, 798–99 (N.D. Tex. 2013); *see also Guillory v. Domtar Indus. Inc.*, 95 F.3d 1320, 1331 (5th Cir. 1996); *MGM Well Servs., Inc. v. Mega Lift Sys., LLC*, No. H-05-1634, 2007 WL 150606, at *4 (S.D. Tex. Jan 16, 2007) (granting motion to exclude expert testimony where expert did not conduct independent analysis and instead relied primarily on what interested party told him); *Stinson Air Ctr., LLC v. XL Specialty Ins. Co.*, SA-03-CA-61-FB, 2005 WL 5979096, at *3 (W.D. Tex. July 8, 2005) (granting motion to exclude expert testimony where expert based opinions on representations of interested party and not on independent review of ordinary sources of financial analysis).

      Furthermore, he does not discuss Plaintiff's injury, the extent that it has affected her work, how long the injury will prohibit her from working fully, or whether he consulted with a vocationalist who could provide such an analysis (*See* Dkt. #29-1). *See Dunmiles v. Jubilee Towing, LLC*, No. 16-14325, 2017 WL 1212091, at *3–4 (E.D. La. Apr. 3, 2017) (finding that an expert economist must rely on supporting evidence such as other experts to determine the base income a plaintiff can probably earn due to his injuries for the future lost wages calculation). The Court could

---

[7] Cavazos states that "upon knowledge and belief, Ms. Exume is employed in the healthcare industry" (Dkt. #29-1 at ¶ 15). Such a statement does not instill confidence that Cavazos knows very much about Plaintiff. First, the statement creates the inference that Cavazos does not actually know Plaintiff's job. Second, employment in the "healthcare industry" is so broad that it is nearly useless. Does Plaintiff work as a receptionist or a neurosurgeon? It is impossible to tell based on Cavazos's report and Plaintiff's Response.

11

easily find that Cavazos's opinion is unreliable on this basis alone. *See id.*; *Orthoflex*, 986 F. Supp. 2d at 798–99; *Stinson*, 2005 WL 5979096, at *3.

Cavazos's opinion is subject to an even greater problem—it is wholly inconsistent with the evidence on the record. Cavazos claims that Plaintiff will lose $15,000 per year (Dkt. #29 at ¶ 16). The financial documents he considered to support this conclusion include three pay stubs from 2024 (approximately a year and a half after the accident), and Plaintiff's Social Security Earnings Statement (Dkt. #29 at p. 9; Dkt. #31 at pp. 12–18). The Social Security Earnings Statement shows earnings before her injury at $70,816 for 2020 and $64,855 for 2021 (Dkt. #31 at p. 13). In 2022 (the year of her injury) she earned $69,330 (Dkt. #31 at p. 13). In 2023 (the year after her injury) she earned $61,169 (Dkt. #31 at p. 13). Thus, even using the highest amount Plaintiff earned in the period of 2020–2023, Plaintiff's maximum earning was $70,816 and her lowest earnings after the injury was $61,189 (Dkt. #31). That leaves a difference of $9,647, which is nowhere near the claimed $15,000 per year. Additionally, Cavazos does not discuss the fact that the Earnings Statement shows that Plaintiff earned significantly less than $70,816 in the years prior to 2020 (*See* Dkt. #29-1; Dkt. #31 at p. 13) (showing earnings between $20,560 and $31,770 from 2009 to 2016 and earnings between $7,309 and $15,946 from 2017 to 2019).

Likewise, Plaintiff's pay stubs from 2024 show a similar problem. The three pay stubs are for March 15, March 29, and April 26 (Dkt. #31 at pp. 16–18). The pay stubs show that Plaintiff was paid on a biweekly basis (*See* Dkt. #31 at pp. 16–18). Averaging the three together yields an average biweekly pay of $2,599.37 (*See* Dkt. #13 at pp. 16–18). Thus, simple math shows that Plaintiff's yearly salary for 2024 based on the average biweekly pay would be $67,583.71. The difference between Plaintiff's yearly earnings for 2020 and the approximate amount for 2024 is

only $2,602.29. Assuming that Plaintiff was paid in accordance with the records she provided, her "lost" earnings are miles away from the claim of $15,000. Problematically, Cavazos does not explain how Plaintiff's claim of losing $15,000 per year is consistent with any of her prior financial earnings (*See* Dkt. #29–1). He concludes, with no analysis or discussion, that Plaintiff's losses are what she claims, even when all of the documentary evidence suggests a contrary conclusion. *See Young v. Brand Scaffold Servs., LLC*, No. 1:07-CV-917, 2009 WL 4674053, at *2–5 (E.D. Tex. Mar. 16, 2009) (excluding an expert economist where the proposed testimony was not sufficiently tied to the facts or supported by other evidence in the record). The Court easily finds that Cavazos's report is self-contradictory and could again find that it is unreliable on this basis alone. *See id.* However, another problem still exists.

The largest gap in Cavazos's analysis is his glaring assumption that Plaintiff's injury, whatever it may be, will remain constant as a permanent disability for the remainder of her life (*See* Dkt. #29–1). Unfortunately, Cavazos is neither qualified to render an opinion as to the permanency of Plaintiff's injury, nor could he do so here as he has not reviewed *any* of Plaintiff's medical records (*See* Dkt. #29–1). *See In re TK Boat Rentals, LLC*, No. 17-1545, 2019 WL 13241984, at *5 (E.D. La. Aug. 9, 2019) (excluding a portion of an expert economist's opinion where he concluded the plaintiff would exit the workforce at 50 due to dementia, despite the lack of any medical evidence that the plaintiff would likely develop early onset dementia at age 50).

In short, Cavazos's entire opinion is based on his own *ipse dixit* that Plaintiff will lose $15,000 per year and that her injury is permanent (*See* Dkt. #29–1). *Pate v. State Farm Lloyds*, No. 3:22-cv-713-K, 2023 WL 4826204, at *3 (N.D. Tex. July 27, 2023) (citing *Ramos v. Home Depot Inc.*, No. 3:20-CV-01768-X, 2022 WL 615023, at *1 (N.D. Tex. Mar. 1, 2022)) ("[T]his Court need

13

not admit testimony that is connected to existing data only by the *ipse dixit*—that is an unproven and unsupported assertion resting only on the authority—of the expert.") (citation modified); *see also Harper v. Geico Indem. Co.*, No. 22-4347, 2024 WL 1141167, at *8–9 (E.D. La. Mar. 15, 2024) (excluding an expert economist's opinion that the plaintiff was permanently disabled and the wage calculation based on the selective use of the plaintiff's highest wage-earning years because those opinions were not supported by a preponderance of the evidence). The analytical gaps in Cavazos's opinion are a chasm and the opinion is wholly unreliable. *Young*, 2009 WL 4674053, at *2–5; *Pate*, 2023 WL 4826204, at *3; *Orthoflex*, 986 F. Supp. 2d at 798–99; *Stinson*, 2005 WL 5979096, at *3; *Harper*, 2024 WL 1141167, at *8–9. Accordingly, the Court finds that it should grant UCL's Motion with respect to Cavazos's opinion on Plaintiff's lost wages and earning capacity.

### IV. Loss of Household Services

For similar reasons, Cavazos's opinion on loss of household services is also unreliable. In determining household services Cavazos again assumes that Plaintiff will be permanently disabled by assuming that her injury will decrease her ability to perform household services by 50% for the rest of her life (*See* Dkt. #29-1 at pp. 6–9, 15–17). He states that Plaintiff is projected to live until the age of seventy-eight (Dkt. #29-1 at ¶ 29). In performing his calculations, he states that Plaintiff will only be able to perform 50% of the household services she used to perform based on her injury (Dkt. #29-1 at ¶ 31). His chart shows that the amount of time she can dedicate to those tasks will remain constant for the remainder of her life (*See* Dkt. #29-1 at pp. 15–17). Yet, as with lost wages and earning capacity, there is no evidence to support that her injury is permanent and will hinder her from performing household services for the remainder of her life, nor of the factual basis to

determine the amount of time Plaintiff spends on the daily household services (*See* Dkt. #29-1).[8] *See supra* Section III; *Young*, 2009 WL 4674053, at *2–5; *Pate*, 2023 WL 4826204, at *3; *Orthoflex*, 986 F. Supp. 2d at 798–99; *Stinson*, 2005 WL 5979096, at *3; *Harper*, 2024 WL 1141167, at *8–9. Accordingly, Cavazos's opinion regarding Plaintiff's lost household services is equally unreliable and should be excluded.

Federal Procedure requires that an expert provide an independent analysis of the facts provided by an interested party to reach a reliable opinion based on accepted methodology. FED R. CIV. P. 26; FED. R. EVID. 702; *Daubert*, 509 U.S. at 589–96. Expert testimony is never appropriate when the witness merely synthesizes a party's trial arguments and presents them as an expert opinion. *Orthoflex*, 986 F. Supp. 2d at 798–99; *MGM Well Servs., Inc.*, 2007 WL 150606, at *4. Here, Cavazos relies upon an unsupported conclusion that Plaintiff is permanently disabled (Dkt. #29-1). For conclusions vital to the reliability of his opinion, he relies on an interview with Plaintiff (*See* Dkt. #29-1 at ¶¶ 16, 28). As far as the Court can tell, the interview consisted of two questions: (1) how much money do you expect to lose each year, and (2) what percentage of your household services can you no longer perform (*See* Dkt. #29-1 at ¶¶ 15, 28). The question of why Plaintiff reached these numbers, how she reached them, and why Cavazos relied on them without explanation are absent from his expert report (*See* Dkt. #29-1). There is no discussion of how Plaintiff's injury impacted her ability to work or perform household services, Plaintiff's job, or Plaintiff's wage fluctuations in the Social Security Earnings Summary (*See* Dkt. #29-1). In short, Cavazos's expert opinion provides a closing argument blueprint for Plaintiff's damages model, not

---

[8] While Cavazos cites to the "survey" performed on Plaintiff, he does not discuss the data or facts he considered from the survey to reach his conclusion (*See* Dkt. #29-1). Instead, he cites it the same way he cites Plaintiff's interview—to support an important conclusion without performing an independent evaluation of those facts.

a reliable expert opinion. Accordingly, the Court finds that Cavazos's expert opinions are unreliable and should be excluded.

## CONCLUSION

It is therefore **ORDERED** that Defendant United Cargo Logistics, LLC's Motion to Exclude Expert Testimony of Roberto Cavazos, Ph.D. (Dkt. #29) is hereby **GRANTED**.

**IT IS SO ORDERED.**
SIGNED this 16th day of June, 2025.

_____
AMOS L. MAZZANT
UNITED STATES DISTRICT JUDGE